# IN THE SUPREME COURT OF IOWA

No. 20–0854

Submitted November 17, 2020—Filed December 18, 2020

**IN THE INTEREST OF J.H.,**
Minor Child.

**J.H.,** Father,

    Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Susan Cox, District Associate Judge.

The State seeks further review of a court of appeals decision reversing the termination of a father's parental rights. **DECISION OF COURT OF APPEALS VACATED; JUVENILE COURT JUDGMENT AFFIRMED.**

Christensen, C.J., delivered the opinion of the court, in which all justices joined.

Alexandra M. Nelissen of Advocate Law, PLLC, Clive, for appellant.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee.

Nicole Garbis Nolan of Youth Law Center, Des Moines, attorney and guardian ad litem for minor child.

**CHRISTENSEN, Chief Justice.**

In this case, we must decide whether the juvenile court was correct in terminating a father's parental rights. The father has an extensive history of involvement with the Iowa Department of Human Services (DHS) due to his issues with domestic violence, substance abuse, mental health, and cognitive functioning, which have led to the termination of his parental rights to ten other children and the removal of his child upon birth in this case. Although he made some progress in addressing his domestic violence and substance abuse issues in this case, he never progressed past fully supervised visits with the child. When serious health issues arose that required the child to undergo multiple surgeries, attend frequent doctors' appointments, and receive special care from his caretakers, the father showed no interest in the child's medical care and failed to gain any understanding of how to care for the child's medical needs.

The juvenile court ultimately found the State had proven the grounds for termination of the father's parental rights and termination was in the child's best interests based on the father's failure to understand the child's medical needs and inability to safely parent. The father appealed,[1] and the court of appeals reversed. We granted the State's application for further review. On our de novo review, we conclude the father remains incapable of safely caring for the child, and there is no indication that his parenting abilities will adequately improve in the foreseeable future despite the extensive services he has received over the years. Therefore, we vacate the decision of the court of appeals and affirm the order of the juvenile court terminating the father's parental rights.

---

[1]The juvenile court also terminated the mother's parental rights, and her appeal was dismissed as untimely.

## I.  Background Facts.

J.H. was born in April 2019.  Mom and Dad came to the attention of DHS at the time of J.H.'s birth due to their significant history of DHS involvement.  This family's history of DHS involvement spans around twenty years and has led to the termination of their parental rights to ten other children for each parent—eight children the parents shared together, two of Mom's children from prior relationships, and two of Dad's children from prior relationships.  The parents have been married to each other since February 2016 and reside together.  Although Mom's termination is not on appeal, we discuss her history and involvement in this case due to Dad's enduring commitment to raising J.H. with Mom and her extended family.

Both parents struggle with cognitive functioning that has impacted their ability to parent in the past.  At the time of trial, Dad was fifty-four years old and Mom was thirty-nine years old.   Dad has cognitive functioning challenges due to a brain injury.  He frequently denies having a brain injury, as he did in this termination hearing, while at other times, he attributes it to a motorcycle accident, an assault, or cocaine use.  He receives services to help manage his day-to-day affairs.  Despite this assistance, Dad still fails to adequately meet his own health needs.  For example, he has hypertension, yet he often forgets or chooses not to take his blood pressure medication.   Similarly, he never engaged in the recommended six-month follow-up CT scan for his lungs related to a stab wound in 2017, and he waited until he was experiencing "increased wheezing, shortness of breath, and cough productive of dark sputum" in 2019 to seek this CT scan.

A 2013 psychiatric evaluation of Mom, which was conducted for the purposes of determining whether she was competent to stand trial,

revealed a full-scale IQ of 55. The psychiatrist determined she was not competent to stand trial and "**NEVER WILL BE.**" The psychiatrist also noted Mom would likely need assistance with "tasks more complicated than tying her shoes" and was "not capable of living independently." Mom receives services to help her with her daily living functions, such as hygiene and shopping.

Both parents have significant criminal histories. Dad has multiple convictions for domestic abuse assault, some of which are felony convictions, as well as convictions for intoxication, disorderly conduct, possession of drug paraphernalia, and assault causing bodily injury. Mom has multiple convictions for assault on a peace officer and disorderly conduct in addition to convictions for harassment of a public official, fifth-degree criminal mischief, and interference with official acts.

Dad first had his rights terminated to two children from a prior relationship in 2008. Leading up to that termination, Dad was subject to a no-contact order because he assaulted one of the children. Mom had her rights terminated to a child from a prior relationship in 2000, whom she gave birth to while she was committed to a mental health institution because she was "accused of several aggressive criminal acts" and found to be incompetent. Mom also had her rights terminated to another child from a prior relationship in 2009.

Mom and Dad have had eight children together before J.H., all of whom the parents have had their rights terminated. Iowa Code section 232.116(1)(*g*) has been a ground for termination in each case involving the parents' rights to the children they had together. When asked at the termination hearing in this case about "reports . . . that it's [her] intent to keep having children until [she's] able to keep one," Mom confirmed, "I did say that, yes, I did."

Mom and Dad had their rights terminated to their first child together, Child 1,[2] in 2009. Just two days after progressing to their first overnight visit in that case, Dad became intoxicated and attempted to hit Mom and cover her face with a pillow while she was holding Child 1. Mom did not initially report this incident because she was afraid of the consequences it would have on their parental rights. The parents failed to show any progress after this incident, and the juvenile court eventually terminated Dad's rights under Iowa Code sections 232.116(1)(*d*), (*g*), and (*l*), and Mom's rights under Iowa Code sections 232.116(1)(*d*), (*e*), (*g*), and (*h*). In doing so, the juvenile court explained,

> [Dad] has not shown he can sustain changes regarding his domestic abusive behavior and substance abuse issues. [Mom] has made her best efforts to learn to safely care for her children. However, she is still unable to make appropriate decisions as indicated by the incidents which caused the removal of [Child 1]. An example of her inability to make appropriate decisions is the fact that [Mom] and [Dad] are now living together. Neither has progressed to the point where they can parent independently.

A year later, the parents' rights to Child 2 were terminated after Dad consented to termination and the juvenile court determined Mom abandoned Child 2. Since then, common themes of domestic violence, substance abuse, mental health issues, and the inability to demonstrate sustained progress have emerged in every one of the parents' subsequent termination cases. While the parents were trying to reunify with Child 3, police responded to the scene of a disturbance in which Mom was out of control and shouting in the street with Dad present. This resulted in Dad's arrest for controlled substances and paraphernalia that police found in Mom's backpack but Dad claimed were his. Mom refused to respond to

---

[2]All of the parents' children together have the initials "J.H." Thus, we refer to the children by numbers in their birth order for ease of explanation and to preserve their confidentiality.

police commands, and police had to tase her three times in order to handcuff her. In that termination order, the juvenile court noted the parents failed to demonstrate "discernable positive change." In their termination of parental rights to Child 4 in 2013, the juvenile court similarly explained the "parents continue to lack the ability or willingness to respond to services which would correct the situation."

Child 5 was removed from the parents' care due to Mom's "unresolved mental health" issues and the parents' domestic violence. The parents failed to participate in services and could not be located for the July 2014 hearing, which led to the termination of their parental rights to Child 5. Child 6 was born in January 2017 in Minnesota, where the parents had gone to have Child 6 with the hopes of avoiding DHS involvement. By May, the parents had returned to Iowa and came to DHS's attention after the parents were involved in a domestic assault incident. Mom tried to pry Child 6 out of Dad's arms to leave Dad after an argument and punched Dad in the eye while he was holding Child 6, resulting in Dad allowing Mom to take Child 6 and leave. Although the juvenile court entered a removal order on May 4 due to the parents' "domestic violence with the child present, [Dad's] ongoing substance abuse, [Mom's] low-functioning capabilities," and the parents' previous terminations of parental rights to other children, the parents went into hiding with Child 6 and could not be located for eighty-one days. In the meantime, DHS received another report of abuse, alleging Dad was using crack cocaine while caring for Child 6.

During the parents' attempts to reunify with Child 6, Mom gave birth to Child 7 and Child 8—twins—prematurely at home in December. The twins' cord blood tested positive for cocaine, and they were hospitalized for at least six weeks. One of the twins was discharged on oxygen and a heart

monitor, and both had special health needs that required regular doctor appointments and physical therapy. As the juvenile court noted in that case, "[t]he parents do not regularly attend these appointments, and are unable to articulate what the twins' special needs are." The juvenile court explained, "Both parents are unaware of the possible long term issues that the twins will have and have a lack of understanding as to why they will need to have long-term attention for medical professionals as to their development."

In July 2018, the juvenile court terminated the parents' rights to the twins and Child 6 under section 232.116(1)(*g*). Regarding Child 6, the parents' rights were also terminated under section 232.116(1)(*h*). In reaching its decision to terminate, the juvenile court explained,

> We are here concerning these children for mostly the same reasons that we were here concerning [the parents' other] children whose initials appear above, including issues of very low intellectual functioning and other mental disabilities, assaultive behavior and domestic violence, and chronic substance abuse. And after over ten months of concerted effort by the professionals and in many aspects, the parents themselves, we still have no resolution in sight to these issues. The parents continue to lack the functional ability, insight, or *sustained, demonstrated change* necessary for the court to place the children in either parent's care, or to continue working toward that goal.
>
> . . . .
>
> . . . Given the ongoing issues of very low intellectual functioning and other mental disabilities, assaultive behavior and domestic violence, and chronic substance abuse, the court has little hope of these issues resolving any time soon. Both parents have been given the opportunity to correct the behaviors that resulted in their child being removed from their care over ten months ago. *They are unable to offer any better assurance of lasting change today than they were then.*

(Emphasis added.)

About nine months later, J.H. was born and removed from the parents' care the day after his birth due to the parents' demonstrated

inability to care for their previous children. He was placed in the care of his paternal uncle and aunt, who have adopted J.H.'s twin siblings. J.H. has remained in their care throughout the course of this case.

On May 2, 2019, there was a postremoval conference for the parents with DHS and Family Safety, Risk, and Permanency (FSRP) service providers regarding J.H. The parents brought a friend from their church, who behaved aggressively and directed the parents to remain silent during the conference. The friend informed the DHS and FSRP professionals that the parents would not have visits unless the friend was present. When the professionals told this friend that she could not attend the parents' visits with J.H., the friend told the parents not to have any contact with DHS or FSRP until the friend was allowed to be there for the contact.

The parents heeded this friend's advice and refused to interact with the DHS and FSRP professionals to even schedule visits with J.H. At the May 31 combined removal and adjudication hearing, the DHS and FSRP professionals attempted to talk to the parents to again set up visitation between them and J.H. The parents' friend from church was again present at the hearing and directed the parents not to talk to DHS or FSRP, and once again, the parents listened to this friend. Eventually, the parents' relationship with this friend deteriorated because she manipulated the parents out of money. The juvenile court adjudicated J.H. as a child in need of assistance (CINA) following this hearing.

The FSRP worker set up a visitation schedule and contacted the parents on June 3 to inform them of the schedule. The contact was successful, and on June 5, the parents had their first supervised visit with J.H. since his removal on April 25. The July DHS report described Dad as "less conscientious about his care for [J.H.]" and documented that "[b]oth parents have been noted to come to visits with poor hygiene and often in

dirty clothes, which is concerning for a very vulnerable child." The report noted there were no significant parenting concerns during these supervised visits, but it underscored this note by stating these visits were "2 hour sessions and do not truly show how [the parents] will care for a child on a daily basis, especially young children that have extensive needs and constant supervision."

In the beginning of August, J.H.'s caretaker took him to an eye clinic because his eyes appeared cloudy and had discharge. The clinic referred J.H. to the University of Iowa Health Care for further assessment. J.H. was seen a day later for his assessment, and the ophthalmologist diagnosed him with severe congenital glaucoma. The ophthalmologist reported J.H.'s eye pressures were "extremely high" and he needed to have surgery the following week.

At J.H.'s next visit following the assessment, the DHS worker explained J.H's medical condition to the parents, and the parents talked to J.H.'s ophthalmologist on the phone. The parents told the DHS worker that it was best they not attend J.H.'s medical appointments but stated they would "call Iowa City for medical updates." DHS also facilitated a family team meeting to discuss J.H.'s medical condition on August 13.

On August 15, J.H.'s ophthalmologist documented that J.H.'s congenital glaucoma is "a life-long condition" and she could not "predict [his] response to first surgery yet" but J.H. "[w]ill likely need close follow up at least for next year." She also wrote, "Patient is at risk of blindness (permanent) if congenital glaucoma is not managed appropriately with medications and/or surgery." Even with multiple surgeries, the ophthalmologist concluded J.H. would likely only have "tunnel vision" at best.

Because of the risks associated with inappropriate management of J.H.'s recovery, the ophthalmologist also wrote a letter regarding J.H.'s care that explained,

> [J.H.] is currently recovering from a surgery and has another planned in the next few days. It is imperative that [J.H.] remain under direct supervision of his foster care-takers (e.g., [his uncle and aunt]) lasting no fewer than 2 weeks. This is to ensure proper medication compliance, appropriate eye hygiene, and healing in the post- and pre-operative period.

Pursuant to these recommendations, the parents could not have visits with J.H. again until October.

J.H. underwent multiple surgeries between August and September, and his treatment also required his caretakers to place various types of eye drops in his eyes multiple times a day. His uncle and aunt traveled with J.H. up to three times per week from the south central Iowa area to Iowa City for J.H.'s medical appointments. During this period, the parents never reached out to anyone regarding J.H.'s health nor attempted to attend any of his surgeries or medical appointments despite having services available to assist them in these tasks.

The parents were able to resume supervised visits twice a week for three-hour periods in October. During these visits, Dad often left Mom to care for J.H. and did not fully engage with J.H. Mom would place what she called "blessing oil"—olive oil—on J.H.'s head and face without concern about it getting in his eyes. On October 4, the State filed a termination petition, seeking to terminate the parents' rights under Iowa Code section 232.116(1)(*g*) (2019). DHS subsequently filed a termination report on October 10, recommending the juvenile court terminate the parents' rights to J.H. The report summarized the parents' issues by documenting the parents' history with DHS involvement and prior terminations, as well as their failure to participate in J.H.'s medical care.

The case was continued to December 23 at the parents' request because they had not been served notice of the termination hearing as of a few days before the originally scheduled hearing. On December 17, the State filed an amended petition to terminate parental rights, adding Iowa Code section 232.116(1)(*h*) as a ground for termination. DHS continued to provide services to the parents, including supervised visitation with J.H. On February 10, 2020, DHS filed an addendum to its October termination report to update the juvenile court on the parents' progress. Though the report noted the parents remained engaged in services and had recently been approved to have visits in their home with J.H., it still recommended terminating the parents' rights.

## II. The Termination Hearing and Appeal.

The parents' termination hearing occurred on February 19, February 26, and March 30, 2020. Dad admitted he had never been to J.H.'s medical appointments and could not remember who J.H.'s doctors were. When asked if he knew about anything done to J.H.'s eyes, Dad answered, "Well, he had patches or something." In response to a question about what J.H.'s surgeries did, Dad responded, "They—I don't know. No, I don't." He could not answer how many surgeries J.H. had undergone, and he said he did not know how he would take care of J.H.'s eyes. Dad could not name the family's long-time DHS worker or the FSRP worker who brought J.H. to the parents' supervised visits, and he gave varying answers about how many children he had.

Mom also could not definitively answer how many children she and Dad had together, "guessing" they had six children. Like Dad, Mom could not answer questions about J.H.'s medical issues and was defensive about putting olive oil on J.H.'s head and face, saying it was not harmful if J.H. got oil in his eyes even though she never consulted a doctor about this.

Dad did not see an issue with putting olive oil on J.H.'s head or face despite neither parent consulting with J.H.'s ophthalmologist about the safety of doing so. When asked if he believed Mom was "functional enough to care for a child," Dad declared, "Absolutely." Despite the parents' claims that they could not attend J.H.'s medical appointments due to transportation issues, the record shows that was not true because the parents had access to a medical transport, gas cards, and bus passes. Additionally, a friend even testified that she would have taken them to appointments if the parents had simply asked.

The guardian ad litem in this case has been the guardian ad litem for the parents' children since 2009, and Dad displayed obvious anger toward her throughout the hearing. The juvenile court had to "repeatedly admonish [Dad] to stop" acting "in an inappropriate and intimidating manner towards the Guardian ad litem." The juvenile court reported Dad "glared, tensed up, and leaned towards [the guardian ad litem] for prolonged periods of time." Additionally, the juvenile court found Mom's sister in contempt after she was "repeatedly admonished" for her behavior during the proceedings. The juvenile court also had to pause the hearing to warn another of Mom's sisters about her disruptive behavior.

Dad's therapist testified that Dad had made progress in gaining insight into his actions involving domestic violence and substance abuse. However, it became clear during questioning that this therapist lacked the full picture of Dad's situation because the therapist relied only on Dad's statements to guide the therapy sessions. Because he only relied on the information Dad told him, the therapist was misguided about various aspects of Dad's life. None of the information the therapist received from Dad was corroborated by any professional associated with this case.

The therapist testified that he believed Dad was "almost up to 2,000 days of sobriety from a substance," or approximately five-and-a-half years. At best, Dad had really only been sober for less than two years because he tested positive for cocaine twice in 2018 while he was under DHS supervision in a prior termination case. The therapist admitted he did not know this information and explained that he did not do drug screens with Dad or specifically provide Dad with substance abuse treatment. Likewise, the therapist was under the false impression that Dad could not attend J.H.'s medical appointments due to transportation and communication issues.

The therapist was unaware that Dad refused to attend visitations for about six weeks pursuant to the advice of a church friend. Nor was he aware of J.H.'s specific medical issues. Mom was also dishonest with her therapist. Once the dishonesty was revealed at the termination hearing, the therapist agreed that Mom's dishonesty could call into question much of her testimony regarding her previous positive conclusions about Mom's progress.

On May 30, the juvenile court issued its ruling to terminate both parents' rights to J.H. under Iowa Code section 232.116(1)(*g*). In its ruling, the juvenile court determined,

> Despite services provided to [Mom] and [Dad] over the last 19 years, they have demonstrated a lack of ability to respond to such services. The parents have mental limitations that no amount of time can resolve to the point where they can provide minimally adequate care to [J.H.].

(Emphasis omitted.)

It also detailed some of the health-related limitations it found precluded the parents "from safely caring for themselves or safely caring for [J.H.]." Specifically, it expressed,

> The parents need help with daily living. [Mom] gets daily assistance from Eyerly Ball and Golden Circle. This help includes "daily hygiene routines." [Dad] has worked with IHH "services to help him manage his day-to-day affairs." Even with this high level of supervision/assistance, the parents have failed to care for their most basic medical needs. [Dad] has hypertension, yet repeatedly does not take his high blood pressure medication. The medical records indicate, he went for "days" without taking it. When [Dad] saw the medical provider, his blood pressure was elevated and concerning. Also, after [Dad] had CT scan with a lung nodule "concerning for malignancy," the medical provider recommended he obtain a follow up CT scan in six months. He did not. [Dad] waited two years, until his symptoms worsened, before returning for the follow up CT scan. After the [Mom] had cataracts removed, the ophthalmologist advised there was some eye tissue— which needed to be removed. [Mom] did not follow up. She misunderstood the medical provider and was afraid they were going to remove her eyeballs.

The juvenile court did not rule on the State's request to terminate parental rights under section 232.116(1)(*h*) as an additional ground for termination, and neither the State nor the guardian ad litem filed a motion to enlarge the juvenile court's order to seek a ruling on that additional ground. *See* Iowa R. Civ. P. 1.904(2) ("On motion joined with or filed within the time allowed for a motion for new trial, the findings and conclusions may be reconsidered, enlarged, or amended and the judgment or decree modified accordingly or a different judgment or decree substituted.").

Both parents appealed the juvenile court's termination ruling, but we dismissed Mom's appeal because it was untimely. In its response to Dad's petition on appeal, the State only asked the court to affirm termination under Iowa Code section 232.116(1)(*g*) and did not assert section 232.116(1)(*h*) as an alternative ground for affirmance. We transferred the case to the court of appeals, which reversed the juvenile court's termination of Dad's parental rights. The court of appeals determined the State failed to meet its burden for termination under Iowa Code section 232.116(1)(*g*), reasoning, "the father did respond to services.

He overcame his substance-abuse and domestic-violence issues and there were no concerns for his ability to parent the child during supervised visitations." One judge dissented, concluding "the State showed by clear and convincing evidence that this father was unable to provide a safe long-term environment for this child," especially due to his "lack of involvement in the basic medical care of this young child." We granted the State's application for further review.

### III. Standard of Review.

We review termination of parental rights proceedings de novo. *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). While we are not bound by the juvenile court's factual findings, we accord them weight, especially in assessing witness credibility. *Id.* "[O]ur fundamental concern" on review "is the child's best interests." *In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014).

### IV. Analysis.

Dad's petition on appeal raises multiple challenges to his termination. First, he claims the district court erred in terminating his parental rights to J.H. under Iowa Code section 232.116(1)(*g*). Second, he maintains termination of his parental rights is not in J.H.'s best interests under Iowa Code section 232.116(2) even if the State demonstrated the grounds for termination were met under Iowa Code section 232.116(1)(*g*). Third, Dad argues the district court "should have found reason not to terminate under the exceptions found in Iowa Code section 232.116(3)(*b*) and (*c*)."

**A. Termination under Iowa Code section 232.116(1)(*g*).** The juvenile court concluded there were grounds to terminate Dad's parental

rights under Iowa Code section 232.116(1)(*g*). Under that section, the State must prove all of the following:

> (1) The child has been adjudicated a child in need of assistance pursuant to section 232.96.

> (2) The court has terminated parental rights pursuant to section 232.117 with respect to another child who is a member of the same family or a court of competent jurisdiction in another state has entered an order involuntarily terminating parental rights with respect to another child who is a member of the same family.

> (3) There is clear and convincing evidence that the parent continues to lack the ability or willingness to respond to services which would correct the situation.

> (4) There is clear and convincing evidence that an additional period of rehabilitation would not correct the situation.

Iowa Code § 232.116(1)(*g*).

Dad only challenges the third and fourth elements. He argues he has made progress in therapy to alleviate the substance abuse and domestic violence concerns present in his past termination concerns and "there was no evidence" that he "lacked the ability to provide for the care of" J.H. He also claims the reason he "was not as participatory as he should have been with [J.H.'s] medical needs" was because DHS did not work with him to figure out J.H.'s needs.[3] We disagree.

Iowa Code section 232.116(1)(*g*) is unique because it is the only ground for termination under chapter 232.116 that requires the juvenile court to find parents have already had their rights terminated to another child who is a member of the same family. *See* Iowa Code § 232.116(1). It

---

[3]To the extent Dad may be claiming DHS failed to provide him with reasonable efforts to reunify with J.H., Dad waived this claim on appeal because he never objected to the sufficiency of the services at the juvenile court level. *See In re L.M.*, 904 N.W.2d 835, 840 (Iowa 2017) (explaining a parent's failure to object to the sufficiency of services "early in the process so appropriate changes can be made" waives the issue and generally cannot raise it later (quoting *In re C.B.*, 611 N.W.2d 489, 494 (Iowa 2000) (en banc))).

is also the only ground that examines whether a "parent continues to lack the ability or willingness to respond to services," only applying to those parents who continue to repeat their parenting wrongs in spite of the services they've received in both the past and present termination cases. *Id.* § 232.116(1)(*g*)(3). Thus, unlike other grounds for termination, which focus more on the parents' behavior in the case at issue, the juvenile court must specifically examine the parents' past termination cases in deciding whether termination is appropriate under Iowa Code section 232.116(1)(*g*). The State still retains the burden of proof under section 232.116(1)(*g*), but the parents' history of past terminations—especially when those terminations were under similar circumstances—is highly relevant in proving the parents lack the ability or willingness to respond to services.[4] Here, Dad has had his rights terminated to all eight other children he had with Mom under this same code section at issue here. Therefore, we cannot ignore Dad's history of inadequate parenting.

It is commendable that Dad took steps to participate in services more in this case than he did in previous cases. Yet, we find little

---

[4]In some states, there is a statutory presumption of unfitness for parents who have been found unfit in a past termination proceeding. *See, e.g.*, Kan. Stat. Ann. § 38-2771(a)(1) (West, Westlaw current through 2020 Reg. & Spec. Sess.) (noting there is a presumption that "a parent is unfit by reason of conduct or condition which renders the parent unable to fully care for a child, if the state establishes, by clear and convincing evidence, that: (1) A parent has previously been found to be an unfit parent in proceedings under K.S.A. 38-2266 et seq., and amendments thereto, or comparable proceedings under the laws of another jurisdiction"); Minn. Stat. Ann. § 260C.301(b)(4) (West, Westlaw current through 2020 Reg. & 1st-6th Spec. Sess.) ("It is presumed that a parent is palpably unfit to be a party to the parent and child relationship upon a showing that the parent's parental rights to one or more other children were involuntarily terminated or that the parent's custodial rights to another child have been involuntarily transferred to a relative under Minnesota Statutes 2010, section 260C.201, subdivision 11, paragraph (e), clause (1), section 260C.515, subdivision 4, or a similar law of another jurisdiction[.]"); *see also In re R.D.L.*, 853 N.W.2d 127, 136–38 (Minn. 2014) (holding Minnesota's statutory presumption that parents who have previously had their parental rights involuntarily terminated to other children are palpably unfit to parent other children does not violate the United States and Minnesota Constitutions because it is narrowly tailored to serve the compelling government interest of protecting the general welfare of children).

credibility in the therapist's testimony that he had had no parenting concerns about Dad. Despite the therapist's testimony that Dad had progressed "tremendously" in addressing his anger issues, it is troubling that Dad continued to openly display anger towards the guardian ad litem throughout the termination hearing to the point where the juvenile court "had to repeatedly admonish [Dad] to stop" acting "in an inappropriate and intimidating manner towards the [g]uardian ad litem." This guardian ad litem has worked with the parents since 2009 with the common goal of furthering their children's best interests, yet Dad remained unable to treat her appropriately.

Dad was not forthcoming with the therapist about his substance abuse history, his past DHS involvement, or J.H.'s medical needs. The therapist did not know how many children Dad ever had in his care, that Dad was manipulated out of money and into refusing visits with J.H. by a church friend, J.H.'s diagnosis, or anything about Mom's functioning level. We also find it concerning that, even after the therapist discovered Dad's history as it was revealed during the termination hearing, the therapist did not feel he needed to know this information to make conclusions about Dad's progress and parenting abilities. Because the therapist only based his conclusions on what Dad told him, Dad was able to successfully portray a false reality premised on half-truths and the utter absence of critical information—information that any therapist would reasonably need to possess before making a recommendation about Dad's ability to safely care for a child.

As DHS noted in the parents' July 2019 report,

> both parents need to understand that simply doing a list does not suffice, but that they will need to truly make changes and gain understanding of their long histories as well as learn to care for themselves and a child's numerous needs.

Although Dad crossed participating in therapy off of his list of services, we cannot say he made changes from it based on the pattern of dishonesty he demonstrated with his therapist.

Dad's domestic violence was not the prevailing concern in this case, but we still have to consider his history of domestic abuse, which includes multiple felony convictions for domestic abuse assault. Parents like Dad must work to change the documented reputation they have established through their actions in past termination cases. *Cf.* Iowa Code § 598.41(1)(*b*) ("if the court finds that a history of domestic abuse exists" in child custody cases, "a rebuttable presumption against the awarding of joint custody exists"). Dad's threatening behavior toward the guardian ad litem during the termination hearing and his failure to be forthcoming about his reasons for DHS involvement, including his domestic violence, call into question the therapist's conclusion that dad has progressed "tremendously" in addressing his anger issues.

Moreover, Dad's history of substance abuse and domestic violence were not the only barriers keeping him from reunifying with J.H. Dad's failure to learn how to care for J.H.'s medical needs and his mental limitations also presented significant challenges to reunifying Dad with J.H. These challenges were not new, as they also contributed to the termination of Dad's parental rights to three other children in 2018 under section 232.116(1)(*g*). There, the juvenile court specifically noted that Dad loved his children and could attend to their basic needs during visits but was not "active in learning about the children's needs, especially those of the twins," who had special medical needs. Similar to Dad's lack of involvement with J.H.'s medical treatment in this case, Dad did not attend the twins' medical appointments and was "unaware of the possible long term issues that the twins will have." He also had "a lack of understanding

as to why [the twins] will need to have long-term attention by medical professionals as to their development."

Dad similarly continues to lack the ability or willingness to respond to services to safely care for J.H. in this situation. Dad made no more efforts to understand J.H.'s medical needs in this case than he did to understand the twins' medical needs in 2018. At the termination hearing, he could not remember the names of J.H.'s doctors and testified that he had not been to any of J.H.'s doctors' appointments. When asked if he knew about anything done to J.H.'s eyes, Dad answered, "Well, he had patches or something." When asked about J.H.'s multiple surgeries and what they did for J.H., Dad responded, "I don't know." It was clear from Dad's testimony that he lacked even a general understanding of J.H.'s serious medical condition or how to care for it.

Dad claims he could not explain J.H.'s medical needs or attend J.H.'s appointments because DHS did not provide him with the assistance he needed, but the record shows otherwise. DHS had a family team meeting to explain J.H.'s medical condition to the parents shortly after his diagnosis, and the professionals supervising the parents' visits with J.H. often discussed J.H.'s condition with the parents. Additionally, Dad had access to a medical transport, gas cards, and bus passes to attend J.H.'s appointments and surgeries. A family friend also testified that she would have taken him if he asked. DHS provided Dad with the services he needed to show an interest in and attempt to gain an understanding of J.H.'s medical needs, but he did not take advantage of them. Dad was altogether neglectful of J.H.'s medical needs, further demonstrating that he was unwilling or unable to respond to the services offered.

At the time of the termination hearing, J.H. was an infant at risk of permanent blindness if his caretakers did not provide him with the proper

treatment. It speaks to Dad's inability to meet J.H.'s medical needs that J.H.'s ophthalmologist found it "imperative" for J.H. to "remain under direct supervision of his foster care-takers" *without parental visits* for at least two weeks after his surgery to "ensure proper medication compliance, appropriate eye hygiene, and healing." Even after J.H.'s postoperative period, his caretakers had to place various eye drops in J.H.'s eyes multiple times a day and make frequent trips to Iowa City for medical appointments. Meanwhile, Dad could not even demonstrate that he was capable of attending to his own health needs, as he either forgot or chose not to take his blood pressure medication "for days" at a time despite his hypertension and could not manage a simple follow up CT scan on time. Dad presented the same inability or unwillingness to understand J.H.'s medical needs as he did when his rights were terminated to his twins in 2018. Consequently, we agree with the juvenile court that "[t]here is clear and convincing evidence that [Dad] continues to lack the ability or willingness to respond to services which would correct the situation" under Iowa Code section 232.116(1)(*g*)(3).

We also agree with the juvenile court that "[t]here is clear and convincing evidence that an additional period of rehabilitation would not correct the situation" under section 232.116(1)(*g*)(4). When the termination hearing commenced, J.H. had been removed from Dad's care for approximately ten months—essentially his entire life. For approximately six weeks following removal, Dad refused to interact with DHS or other professionals attempting to reunify him with J.H. at the advice of a church friend who manipulated him for money. This prevented DHS from scheduling visits between Dad and J.H. for those six weeks during a crucial bonding stage in newborn J.H.'s life. When asked at the termination hearing why he chose not to visit J.H. at the advice of his

church friend, the only insight Dad provided was that he did that "because how the DHS was doing us."

Dad continued to show no insight into what was required of him as a parent beyond simply attending the supervised visits with J.H. He frequently complained about and tried to reject the FSRP provider's recommendations for J.H.'s care, reporting that he knew what he was doing. When the service provider told the parents that J.H.'s caretaker requested they use a certain type of bottle to feed J.H. to prevent J.H. from getting gas, Dad claimed it did not make sense and that J.H.'s caretaker was just on a "power trip." He also had issues providing J.H. with the wrong formula. He testified that he had not provided J.H.'s caretaker with any money to assist in J.H.'s care because his brother "gets social security and all that stuff," although he was informed that his brother was not receiving financial assistance to care for J.H. All of this was in addition to the previously discussed lack of involvement in J.H.'s medical care.

Although Dad generally met J.H.'s basic needs during his fully supervised visits, there is a substantial difference between meeting a child's needs under the supervision and guidance of other people and being able to independently care for a child, especially a child with J.H.'s unique medical needs. *Cf. In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996) ("Visitation, however, cannot be considered in a vacuum. It is only one element in what is often a comprehensive interdependent approach to reunification. If services directed at removing the risk or danger responsible for a limited visitation scheme have failed its objective, increased visitation would most likely not be in the child's best interests."). J.H. is a young child with serious medical needs who requires "constant, responsible, and reliable" parenting. *In re A.B.*, 815 N.W.2d 764, 777 (Iowa 2012) (quoting *In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990)). Throughout

this case, Dad only showed an interest in J.H. during supervised visits and was otherwise content to sit back and let others care for J.H., and there is "clear and convincing evidence that an additional period of rehabilitation would not correct the situation" under Iowa Code section 232.116(1)(*g*)(4). In reaching this conclusion, we give weight to the juvenile court's finding that it "d[id] not believe the parents will *ever* be able to provide minimally adequate care for [J.H.]." (Emphasis added); *see In re A.S.*, 906 N.W.2d at 472 (noting we accord the juvenile court's factual findings weight).

"Children simply cannot wait for responsible parenting." *Id.* at 474 (quoting *In re C.K.*, 558 N.W.2d 170, 175 (Iowa 1997)). "While we recognize the law requires a 'full measure of patience with troubled parents who attempt to remedy a lack of parenting skills,' Iowa has built this patience into the statutory scheme of Iowa Code chapter 232." *In re Z.P.*, 948 N.W.2d 518, 523 (Iowa 2020) (per curiam) (quoting *In re C.B.*, 611 N.W.2d 489, 494 (Iowa 2000) (en banc)). The legislature carefully constructed this time frame to balance the parent's efforts toward reunification and the child's best interests. *Id.* at 524. For children J.H.'s age, that time frame is six months, and then "termination proceedings must be viewed with a sense of urgency." *Id.* at 523–24 (quoting *In re C.B.*, 611 N.W.2d at 495).

At the commencement of the termination hearing, J.H. had been removed from Dad's care for approximately ten months, beginning the day after J.H. was born. Dad has received services intermittently through DHS for about a decade and had his rights terminated to ten other children, eight of them under the same code section the juvenile court relied on to terminate his rights to J.H. Nevertheless, Dad still has many of the same parenting deficiencies that he displayed over the last decade in his prior termination cases.

As the juvenile court aptly explained in Dad's 2018 termination case involving Children 6 through 8,

> [Dad] has a 38 year history of addiction to crack cocaine. He has been determined to be fully disabled by the Social Administration since 1999 due to a brain injury received in a motorcycle accident, a beating, or both. He, too, has a long history of assaultive behavior and domestic violence. These themes presented themselves again [in this case]. The only difference with these children is that [Mom] and [Dad] tried to put themselves in a position to demonstrate that they could, together, be parents. It has been a sincere effort, and it has been the court's pleasure to get to know these parents closer to the way they would want to be known. Unfortunately, their efforts are simply not enough to change the themes that resulted in the prior terminations.

That same summary and conclusion is just as applicable to this case as it was in the 2018 termination case.

Dad participated in services throughout the course of J.H.'s removal, but J.H. still could not be safely placed in his care due to a combination of Dad's failure to grasp J.H.'s medical needs, lack of interest in parenting J.H. outside of visits, and an inability to show sustained, demonstrated change. "Rather than speculate about what the future holds for Dad . . . , it is more accurate to look in the rear-view mirror and make a decision for [J.H.] based on what has already happened . . . ." *In re B.H.A.*, 938 N.W.2d 227, 236 (Iowa 2020). After years of services to remedy his parenting skills, there is still no indication that any period of additional time at this point would correct the situation under Iowa Code section 232.116(1)(*g*)(4). Accordingly, like the juvenile court, we find clear and convincing evidence to support termination of Dad's parental rights under Iowa Code section 232.116(1)(*g*).

**B. Best Interests of the Child.** We next turn to the best-interests framework in Iowa Code section 232.116(2), as Dad argues termination of his parental rights was not in J.H.'s best interests regardless of whether

the State proved the grounds for termination under section 232.116(1)(*g*). In considering whether termination is in the child's best interests under 232.116(2), we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). This consideration may include "[w]hether the parent's ability to provide the needs of the child is affected by the parent's mental capacity or mental condition" and the child's integration into a preadoptive home. *Id.* at § 232.116(2)(*a*)–(*b*). We also

> look to the child's long-range as well as immediate interests. This requires considering what the future holds for the child if returned to the parents. When making this decision, we look to the parents' past performance because it may indicate the quality of care the parent is capable of providing in the future.

*In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006) (quoting *In re C.K.*, 558 N.W.2d at 172).

Dad contends termination is not in J.H.'s best interests because termination will prevent J.H. from "establish[ing] important and vital connections with his parents and other biological relatives on the Mother's side." Dad also maintains termination is not in J.H.'s best interests because it will deprive J.H. of the "unique important cultural opportunities by being placed outside of an African American home or a culturally aware home," but this issue was never raised below. Neither the termination order nor Dad's petition on appeal mention the parents' race, but police reports and medical notes about the parents in the record show Dad is Caucasian and Mom is African-American.

The juvenile court's termination of Mom's parental rights to J.H. is final. "[I]n termination of parental rights proceedings each parent's parental rights are separate adjudications, both factually and legally." *In*

*re D.G.*, 704 N.W.2d 454, 459 (Iowa Ct. App. 2005). Dad does not have standing to contest termination of Mom's parental rights. *See In re K.R.*, 737 N.W.2d 321, 323 (Iowa Ct. App. 2007). Even if the argument about raising J.H. in a culturally aware home had been preserved and Dad had standing, race is but one factor for the district court to consider in determining a child's best interests and it "pale[s] into insignificance when we compare the health needs of th[e] child." *In re A.B.*, 815 N.W.2d at 777 n.7 (alterations in original) (quoting *In re F.W.*, 870 A.2d 82, 86 (D.C. 2005) (per curiam)).

The problem of standing aside, it is especially troubling that much of Dad's best-interests argument focuses on maintaining a relationship between J.H. and Mom and Mom's relatives. This is clearly not in J.H.'s best interests. Mom has unresolved mental health issues that result in aggression and assaultive behavior. Her sister displayed similar problems during J.H.'s termination hearing, as she was sentenced to serve seven days in jail for contempt for her disruptive and threatening behavior during the hearing. The juvenile court also had to pause the termination hearing to warn another of Mom's sisters about her troubling behavior. Dad even told his therapist that Mom has issues with her family because they "break[] her down" with the way they talk to her.

As we have already noted, Mom has very low cognitive functioning. In evaluating Mom's competency, a psychiatrist concluded she would likely need assistance with "tasks more complicated than tying her shoes." Mom cannot maintain her own daily living functions independently, let alone independently parent a child with serious medical needs. After having her rights terminated to ten other children over the course of twenty years and intensive services, Mom was in no better position in this case to understand or overcome her parenting deficiencies in order to safely

parent J.H. Nonetheless, Dad testified that he thought Mom was "[a]bsolutely" capable of caring for a child.

Dad continues to reside with Mom, and his commitment to keeping J.H. around Mom and her family is just another example of Dad's inability to make appropriate parenting decisions. Poor decision-making related to each parent's commitment to one another has been a problem since the termination of the parents' first child together in 2009, when the district court noted "the fact that [Mom] and [Dad] are now living together" as an example of Mom's "inability to make appropriate decisions." If we were to return this child to Dad, we would essentially be nullifying the juvenile court's termination of Mom's parental rights because Dad intends to raise J.H. with Mom.

Overall, termination is in J.H.'s best interests based on J.H.'s immediate and long-range interests. J.H. is too young to care for himself, and he is at risk of permanent blindness if his caretaker does not provide him with the appropriate treatment for his congenital glaucoma. In determining J.H.'s best interests, "we look to [Dad's] past performance because it may indicate the quality of care [he] is capable of providing in the future." *In re J.E.*, 723 N.W.2d at 798 (quoting *In re C.K.*, 558 N.W.2d at 172). In this case, Dad's past performance—in both the 2018 case involving his twins with special medical needs and in this case—shows Dad cannot grasp how to parent a child with special medical needs.

It is reasonable to assume Dad will struggle with a medically fragile infant in this case. It is also reasonable to assume that Dad would not ask for help if he was having problems meeting J.H.'s needs because the parents previously tried to evade DHS by declining to report domestic violence, fleeing to Minnesota to give birth there, hiding with a child after a removal order was issued for the child, having twins born prematurely

in their home, and avoiding prenatal care. Frankly, had the juvenile court ruled on the State's request to terminate Dad's parental rights under Iowa Code section 232.116(1)(*h*), which asks whether "[t]here is clear and convincing evidence that the child cannot be returned to the custody of the child's parents" at the time of the termination hearing, we have no doubt that the answer would have been "yes."

Even with daily assistance, Dad struggles to meet his own basic medical needs. Although a parent's mental limitations alone are insufficient grounds for termination, they "can be a relevant consideration when it affects the child's well-being." *In re A.S.*, 906 N.W.2d at 473. Dad has received a plethora of services in an attempt to remedy inadequate parenting skills over the course of many years and many termination cases, but he still lacks the same "functional ability, insight, or sustained, demonstrated change necessary for the court to place [J.H.] in [his] care" that the juvenile court noted when it terminated Dad's rights to three other children in 2018. "[C]hildren should not be placed at risk so their parents can experiment with their parenting skills." *In re M.B.*, 553 N.W.2d at 346.

Dad already wasted valuable opportunities throughout J.H.'s life to connect with him. As we have discussed, Dad did not have any visitation with J.H. for approximately the first six weeks of J.H.'s life because Dad refused to interact with the professionals who could facilitate those visits. Dad also chose not to attend J.H.'s medical appointments and surgeries, where he would have had other opportunities to interact and bond with J.H. Because he skipped these events, Dad missed out on months' worth of contact with J.H. Dad never progressed beyond fully supervised visits with J.H., J.H. has never been in Dad's care, and the record shows no significant bond between J.H. and Dad. Dad chose to minimize his connection to J.H., and the time for him to remedy his lack of parenting

skills has expired. *See In re Z.P.*, 948 N.W.2d at 523–24 (explaining the time frame for a parent to remedy a lack of parenting skills before termination is "viewed with a sense of urgency" (quoting *In re C.B.*, 611 N.W.2d at 495)).

"[W]e cannot deprive [J.H.] of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday [Dad] will learn to be a parent and be able to provide a stable home for the child." *In re P.L.*, 778 N.W.2d 33, 41 (Iowa 2010). J.H. has lived with his paternal uncle and aunt virtually his entire life, and they have ensured that all of J.H.'s medical needs are met.[5] They also adopted J.H.'s twin sisters, and the concurrent plan in case of termination has long been for them to adopt J.H. *See* Iowa Code § 232.116(2)(*b*) (noting the existence of a preadoptive home and the child's integration into that home as considerations in determining the child's best interests); *In re J.E.*, 723 N.W.2d at 800 (stating there is a "preference" in juvenile law "to keep siblings together"). J.H. has integrated into their home, and termination of Dad's parental rights would allow J.H. to be adopted into what he has always known as his home with two of his siblings. Consequently, we conclude that termination of Dad's parental rights is in J.H.'s best interests to enable J.H.'s permanent placement in an adoptive home.

**C. Exceptions Precluding Termination.** Within his claim that termination is not in J.H.'s best interests, Dad passively states the district court "should have found reason not to terminate under the exceptions found in Iowa Code section 232.116(3)(*b*) and (*c*)." Dad's argument on this

---

[5]Although we stressed our concerns about Dad's desire to keep J.H. around Mom and her family, we do not have the same concerns about J.H.'s placement with Dad's brother. Dad's brother and the brother's wife have proven more than capable of caring for J.H. and his twin siblings, and the DHS records indicate Dad harbors animosity towards his brother and was not supposed to know where his brother lives.

issue is unclear because he blended it into his best-interests argument and mentioned no facts or cases explaining why these exceptions apply even though he has the burden to prove them. *See In re A.S.*, 906 N.W.2d at 476. We acknowledge the expedited time deadlines and abbreviated procedures governing termination appeals may pose challenges for the attorneys, and we strive to accommodate those challenges through our appellate rules governing chapter 232 cases. However, it makes it much more difficult for us to address a parent's argument on appeal if the petition does not separately identify and argue each issue presented.

In this case, the juvenile court did address the possible existence of section 232.116(3) exceptions, so we will assume that Dad's argument is properly before us. Under section 232.116(3), subsections (*b*) and (*c*) provide:

> The court need not terminate the relationship between the parent and child if the court finds any of the following:
>
> . . . .
>
> *b.* The child is over ten years of age and objects to the termination.
>
> *c.* There is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship.

Iowa Code § 232.116(3).

Iowa Code section 232.116(3)(*b*) is inapplicable because J.H. was just under a year old at the time of the termination hearing. Section 232.116(3)(*c*) also does not preclude termination in this case because there was no evidence of a close bond between Dad and J.H. J.H. was removed from Dad the day after his birth and was never returned to his care. The record shows Dad often left Mom to care for J.H. during visits and did not fully engage with J.H. To the extent that a bond did exist, there is no

evidence that terminating it would harm J.H. *See In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014) (holding section 232.116(3)(*c*) did not apply because there was no evidence that termination would harm the child, who "was just over a year old at the time of trial" and had a close bond with her relative legal custodian). We affirm the district court's order terminating Dad's parental rights.

## V. Conclusion.

For these reasons, we vacate the decision of the court of appeals and affirm the juvenile court's order terminating Dad's parental rights.

**DECISION OF COURT OF APPEALS VACATED; JUVENILE COURT JUDGMENT AFFIRMED.**